**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

GREGORY KIMBLE,                                    Case No. 1:23-cv-00350

        Plaintiff,                                 Bowman, M.J.

        v.

BRETT GLECKLER, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER[1]**

Plaintiff Gregory Kimble filed a complaint, amended on September 21, 2023, in which he alleges that three individuals employed by the Cincinnati Police Department violated his civil rights while executing an arrest warrant for another individual. All three Defendants have moved for summary judgment. For the reasons that follow, Defendants' motions will be DENIED in part and GRANTED in part.

**I.     Standard of Review**

Pursuant to Rule 56, Fed. R. Civ. P., summary judgment will be granted if the evidence submitted demonstrates that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986). If the moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine

---

[1]Pursuant to 28 U.S.C. § 636(c) and with the consent of all parties, this case is assigned to the undersigned for all proceedings, including trial and the entry of judgment. (*See* Doc. 23).

issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348 (1986). "[A] court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). In order to survive summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson.*, 477 U.S. at 249-50.

## II.     Findings of Fact

On June 7, 2022, a manager of a Little Caesar's Pizza restaurant was shot in the leg. Defendant Carl Blackwell was the lead detective assigned to investigate. The victim identified a woman who previously worked there, Angel Kidd, as the shooter. During the investigation, witnesses reported that Kidd was seen "getting into a blue SUV" and was accompanied in the car by a black male wearing a red gator over his face. Doc. 31-1, PageID 93. Based on his investigation, Detective Blackwell prepared and filed an arrest warrant for Kidd, as well as a complaint and affidavit for felonious assault. He passed that information along to the Fugitive Apprehension Squad ("FAS"), a unit that executes arrest warrants. Doc. 42, PageID 289-290.

Police Officer Scott Bode was part of FAS on June 8, 2022, the date the warrant was executed, and was assigned to "perimeter" duty. To prepare for the day, Bode reviewed Blackwell's Arrest and Investigation/Offense Report, as well as the Complaint, Affidavit and Arrest Warrant. Doc. 31, PageID 88-89. As a result of his review, Bode learned that Kidd was charged with felonious assault, and that she was alleged to have fled the scene in a blue SUV. A summarized witness statement stated that the shooter was accompanied in the vehicle by a "male black" wearing a red face gator described as

33 years of age, 5' 10" tall, and weighing 200 pounds.[2] No additional description of the black male or of the make, model, or license plate of the "blue SUV" were provided on the typed summary. Doc. 31-1, PageID 91-96. But Blackwell testified that the male was reported to be a passenger who told the shooter "not to do it." Doc. 35, PageID 168, 171.

Defendant Mark Longworth was among the officers who executed the arrest warrant for Kidd on June 8. The arrest occurred at Kidd's friend's apartment, where Kidd had been staying. Close in time to her arrest, Plaintiff Kimble, a black male who was 33 years of age, drove to the apartment complex in a dark green SUV. Doc. 44, PageID 381-382. Observing the heavy police presence, Kimble parked his car and walked toward the suspect's friend's apartment. As Kimble approached a hallway leading to several apartments, his path was obstructed by police who were preparing to break down the apartment door. The officers' conversation with Kimble was recorded by Defendant Longworth's Body Worn Camera ("BWC"):

Officer: Hello, sir, how's it going today? Which apartment are you in?

Kimble: I ain't in none of these apartments.

Officer: Okay. You trespassing?

Kimble: Nah, you gotta be told you can't be in a place to consider trespassing.

Officer: If you don't have any business here, you can go back out. Or else uh…

Longworth: Or tell her to open the door cause we're getting ready to break it.

---

[2]The investigator's affidavit and complaint against Kidd state that she "fled the scene in a blue SUV" *without* reference to the black male. The witness statement provides a cursory reference to a male companion in the SUV but is silent on whether he was a driver or a passenger.

Kimble: Oh.

Longworth: Yeah.

Officer: Alright, take it easy.

Longworth BWC4 25:00-25:30. Kimble retreated without further comment. After he left, officers broke down the door and arrested Kidd.[3]

Kimble returned to his green SUV but drove only a short distance to a different space in the same parking lot. Bode watched as Kimble then walked back toward the building he had just left. Bode viewed Kimble's action as suspicious[4] and alerted his fellow officers: "That guy in the SUV parked around the corner, he's out of his car, walking in that general direction. …I mean I know he's not a suspect but if it's in the report, it was reported that she got into a blueish greenish [indecipherable] SUV with a guy." Longworth BWC4 38:00-38:20; Bode affidavit, Doc. 31, PageID 89.

At the time of Bode's transmission, Longworth was trying to contact Detective Blackwell to inform him of Kidd's arrest. Longworth reached Defendant Brett Gleckler instead. Gleckler had no personal knowledge of the case but was with Blackwell at the time. Relevant portions of Longworth's conversation, along with statements by Bode, were recorded as follows:

Longworth: Okay and the other thing is, the dude that maybe was an accomplice in the car has been showing up. He's parked around the corner now. So, we haven't stopped him. He tried coming in here while we were at the door, and read us some line of bullshit about why he should be here. But um. We just sent him on his way not knowing he might be involved. But apparently Bode remembers from the report maybe he's in it too. I think that's why he came in. I think. Is that the blue SUV, Bode?

---

[3]Charges against Kidd were eventually dismissed when the victim failed to appear for trial.
[4]Kimble testified that he moved his car in order to avoid being blocked in. Doc. 44, PageID 387.

Bode: Yeah it was blueish greenish and he parked it around the corner….

Longworth: OK, I think they're going to want that. I'm on the phone with them now. Okay um, so. I'll see if we, we're kind of committed to this apartment, I don't know if we can do it or not. But at least get a plate, if we can get him stopped we will.

* * *

Longworth: District 4 wants the apartment. They're going to dispatch a uniform car to help with that. If we have a way to stop that uh gentleman in the car, they want the car as well. I told them I wasn't sure we had the people to do it.

* * *

Bode: Yeah, he's still standing out there….

Female officer: Just hang on a minute, what's his name?

Bode: Yeah, not knowing any more than the report said, um, him being that interested in that apartment, I'm gonna assume he was the getaway driver in that.

* * *

Longworth: Yeah, I gave the facts to the detective and he indicated that, that, that uh, he would like him stopped, so, I'm assuming based on that they feel like there's probable cause to stop this person.

Gleckler Depo. Doc. 33, PageID 109; Longworth BWC4 37:50-42:35.

Gleckler testified that he repeated the information from Longworth to Blackwell. Blackwell ordered Kimble to be transported to District 4 so that Blackwell could speak to him there. Blackwell Depo., Doc. 35, PageID 173-176, 188; *see also* Doc. 47, PageID 700 ("Blackwell ordered the officers on scene [to] transport Kimble to CPD District 4 to be questioned by Blackwell.").

After conversing with the detectives, Longworth exited the apartment building, suggesting that officers come up with "a quick plan to try and grab that car I guess." Longworth BWC4 43:00- 43:07. An officer then observes Kimble walking toward the

officers. When Kimble sees them, he stops in the parking lot and waits for the officers, greeting them as they drew near. An officer asks, "Do you know that person [referring to the arrestee], to which Kimble responds, "I believe so." Longworth BWC4 43:42 – 43:48. An officer then asks, "Do you have any ID on you sir?" *Id.,* 44:04. As Kimble answers, Longworth approaches from behind and abruptly orders: "Place your hands behind your back, you're going in handcuffs right now, you're being detained." *Id.*, 44:04-44:18. Nonparty Officer Charles Knapp suggests detaining Kimble in his police cruiser, a plan with which Longworth agrees. *Id.*, 45:00 to 45:25. While handcuffed, Kimble continues to respond to the question about his ID, directing officers to a wallet in his pocket. In addition to removing his wallet, Longworth removes Kimble's keys and walks in the direction of his parked SUV.

In the meantime, Knapp escorts Kimble to his cruiser. Knapp's motor vehicle camera ("MVR") provides an additional 53 minutes of recorded activity. Kimble repeatedly asks why officers have detained him; they respond that it is because a detective wants to speak with him. Kimble expresses his willingness to answer any investigatory questions that officers may have[5] but the officers state that they have none:

> Kimble: Ok what would you like to know?
>
> Officer: What's up, sir?
>
> Kimble: I said, ok now what would you like to know?
>
> Officer: Um. I don't really have ….
>
> Kimble: So why am I being detained?
>
> Officer: What - what are you asking?

---

[5]No *Miranda* warnings were given. *See* Kimble Depo., Doc. 44, PageID 428.

Kimble: Why am I being detained?

Officer: I don't really have any questions for you.

Kimble: Ok. So why are you detaining me?

Officer:  Uh, the detective wanted to.

Kimble: OK. Why did you choose to – why did the detective choose to detain me?

Officer: Because he believes you're somehow associated with the crime that the, uh, the occupant of the apartment we were serving a warrant on.

Kimble: And why because I – and why does he believe that I'm associated with the crime? I believe it's one thing to be associated with the suspect…

Officer: yeah

Kimble: But how does he believe that I'm associated with the crime or how does my vehicle have anything to do with that?

* * *

Kimble: ….Well all I'm doing, I'm just a person that's here who y'all don't know so y'all chose to detain me for whatever reason.

Officer: So I told you a legitimate reason that you're being detained…

Kimble: You actually didn't tell me a legitimate reason I'm being detained.

Officer: …All I can do is try to communicate….perhaps the detective can clear it up.

Knapp MVR 1:00-2:55.

When Longworth returns to Knapp's cruiser, he and Kimble engage in the following

conversation:

Kimble: Now sir, I was told that you are the person that I should be talking to ask why am I being detained and how do you figure that I'm associated with the crime? I understand that you may believe that I'm associated with the suspect but what does that have to do with the crime?

7

Longworth: You're being detained because we have reason to believe that you may have involvement in the original offense being investigated … which is a felony assault.

Kimble: Exactly. Now how do you…

Longworth: We're not going to do a thing where you ask me a bunch of questions. I'm telling you why you're detained out of courtesy but that's about all you're going to get from me. Um. The detectives that are actually investigating the case are going to come up here, What they do with you or want done with you, I don't know at this point. But they requested us to detain you and that's the reason. I don't know what they know or what they don't know. Alright?

Kimble: Ok. So how long is this process going to take? And why do I have to be arrested – I'm not resisting at all. Why do I have to be cuffed?

Officer: You're cuffed as a safety precaution because the offense being investigated is a violent offense with a firearm. So that's how you have to be for now. If they get here and they make another determination that's on them, ok? This way we know you're safe.

Kimble: But I'm perfectly willing to-  I actually said hey sir and confronted you so why are you cuffing me in order…

Knapp MVR 3:23 - 4:42.

Over the next minute and a half, Kimble states that he willingly approached officers and engaged them in conversation to determine whether Kidd, who he eventually identifies as a distant cousin, had been arrested and to advise her "to wait 'til she get a lawyer before she opens her mouth." *Id.*, 5:48-5:55. An officer responds: "Well unfortunately you didn't get a chance to tell her that before she got arrested," to which Kimble replies, "Well, before I got arrested."  The officer corrects Kimble by stating that "we arrested you after her, so…" Kimble responds with surprise, repeating his explanation about waiting around to see if Kidd had been arrested:

Kimble: Oh so she was already in there arrested? What? I was just hanging

8

around to tell her on her way out that uh "don't open your mouth until you get a lawyer."

Knapp MVR 5:55 to 6:15. A period of silence on the MVR suggests that officers briefly left Kimble alone in the cruiser, during which time he retrieved his cellphone from his pocket and speaks into it. Knapp MVR at approx. 6:45-9:00.

Approximately ten minutes after placing Kimble into the cruiser, an officer enters the front seat to review his criminal history on the vehicle's computer. *Id.*, 9:45. A few minutes after that officer departs, Kimble again speaks on his phone to someone, stating that he had gone to Kidd's apartment complex when he heard she had gotten herself in legal trouble to "tell her to keep her mother f***in' mouth shut." Knapp MVR 24:24-25:00.[6] This time, officers instruct him to hang up because he is "in custody." Knapp MVR 27:20-27:25. Longworth adds: "You're not entitled to keep your property, give us the phone now…..You're under arrest." Longworth BWC1 00:35-00.43; *see also* Knapp MVR 27:45-27:55.

Plaintiff again questions his arrest and asks what he is charged with. Officer Longworth responds: "You're being transported to District 4 when a car gets here," and "you don't have a charge." Longworth BWC1 00:45-1:05. When Kimble questions why officers first told him he was only being detained for questioning but now were telling him that he was arrested, Longworth explains: "…I had another conversation with the investigator, and he indicated that you're going to District 4, which means that if we take you somewhere, we've arrested you." Knapp MVR 27-28:30; Longworth BWC1 1:05-1:30.

Over the next two minutes, Kimble and Longworth discuss Kimble's status:

---

[6] The undersigned prefers not to repeat the exact word in this opinion.

Longworth: Now listen. I want you to understand a distinction…. The legal meaning of arrest is when we handcuff you and move you around, like taking you to the police station, we have by law arrested you. Whether we charge you with a crime or not, it's an arrest and requires certain things of us. So that's why I'm telling you you're under arrest. Because we're taking you somewhere in handcuffs, that's depriving you of your rights. Ok? Therefore, we have to have a reasons for that, and that means we have to have enough reason to arrest you. We do …according to the detectives. And that, as far as what that is, is between you and them, I don't know what they'll tell you. I haven't talked to them about what all their reasons are because it doesn't matter to me. Ok. But that's the situation you're in. That's why it changed, detained to arrest, because I didn't know at the time that they wanted you taken somewhere.

Kimble: Now am I a suspect or am I a person of interest?

Longworth: ….If we're going to take you somewhere against your will, which we are, 'cause you're not asking to go there, then you have to be a suspect. Now whether or not you did it or not - why they think you're a suspect - I don't know. You you might not be, and you might be able to clear up….

Kimble: I just want to know what I am a suspect of?

Longworth: Whatever this shooting is that she's charged with….

\* \* \*

Longworth: She's alleged to have shot somebody. A shooting. And that's what she's charged with. She has a warrant for that. She's charged. So I don't know what happened. I don't know why, I don't know where. We're serving this warrant. But on the word of the detectives, that's what we're doing, ok? No disrespect….

\* \* \*

Longworth: ….I just don't know anything else. All we are is the police that come and get you. We're not the police that investigate things.

Longworth BWC1 4:20-6:40;  Knapp MVR 31:30 to 33:45.

After nearly an hour, Kimble is transferred, still handcuffed, to the back of another cruiser for transport to the District 4 police station. At the station, Blackwell interviews him, removing his handcuffs and stating that he will not be charged. *See* Kimble Interview 10:38 – 18:47. At the end of the interview, Blackwell instructs Kimble to "sit tight" while

Blackwell checks on the status of his car. Officers eventually transport Plaintiff back to the apartment complex, where an officer returns his car keys to him. Defendants allege that Kimble was detained for only 90 minutes, but on summary judgment, the Court credits Plaintiff's account that he was detained for 110 minutes.[7]

After his release, Plaintiff filed a complaint with the Internal Investigations Section ("ISS") of the Cincinnati Police Department. The ISS report contains summaries of statements by the officers. *See e.g.*, Doc. 49-2, PageID 761-762 (reporting Blackwell's admission that he asked for have Kimble to be transported to District 4 for an interview without confirming Kimble's consent to being transported). Plaintiff also filed a complaint with the City of Cincinnati Citizen Complaint Authority ("CCA"), which report also includes summaries of officers' statements. *See* Doc. 49-1, PageID 743, ("When interviewed, Specialist Longworth stated that his reason for detaining Mr. Kimble was based on information provided by the detectives."). On June 7, 2023, Plaintiff filed this federal lawsuit. In his amended complaint, he alleges that Detective Blackwell, Detective Gleckler, and Officer Mark Longworth are liable in their individual capacities for false arrest, failure to intervene to prevent false arrest, and for civil conspiracy. *See* Doc. 13.

## III.  The False Arrest Claim

### A.  Plaintiff's Seizure under the Fourth Amendment

Because Kimble's failure-to-intervene and civil conspiracy claims rise or fall on his

---

[7]The time that elapsed from the moment that Kimble was handcuffed until he was placed in the back of Knapp's cruiser appears to have been approximately 5 minutes. Kimble spent approximately 53 minutes in the back of Knapp's cruiser before being moved to Robinson's cruiser for transport to District 4. Based on the video record, it appears that transport and walking through the station took approximately 18 minutes. *See* Robinson MVR and Robinson BWC3. The video labeled as "Kimble interview" shows him sitting in a room for approximately 30 minutes.

false arrest claim, the pending motions for summary judgment focus on whether Plaintiff was seized without probable cause in violation of the Fourth Amendment. Under settled Supreme Court and Sixth Circuit case law, an encounter between police officers and a citizen may be characterized in one of three ways under the Fourth Amendment:

> "'(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.'"

*United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (quoting *United States v. Waldon,* 206 F.3d 597, 602 (6th Cir. 2000) (additional quotation omitted)).

Defendants concede that their seizure of Plaintiff eventually became an arrest. But they dispute the precise moment that the arrest occurred. In their memorandum in support of summary judgment, Longworth and Gleckler initially assert that, based on their collective knowledge, they had probable cause to arrest Kimble by the time that police encountered him in the parking lot. "[B]elieving there was probable cause to arrest, [Longworth] went outside, cuffed him [Kimble], and placed him in a cruiser." Doc. 48 at PageID 721; *see also id.*, PageID 728 ("it is not contested that Kimble was arrested" when he was placed in the back of a cruiser). Plaintiff' agrees, maintaining that he was arrested when he was handcuffed and placed in the back of Knapp's cruiser.

But Defendant Blackwell's separate motion does not concede that Plaintiff was arrested at that moment. Instead, Blackwell suggests that for the first half hour after being placed in the back of Knapp's cruiser, Kimble was subject to what is commonly known as an investigatory *Terry* stop. Only "articulable suspicion" for a *Terry* stop is required to comport with the Fourth Amendment – far less than the "probable cause" standard

12

required for a warrantless arrest. *See Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. 1868 (1968).

In a combined reply memorandum, Defendants Longworth and Gleckler reframe their argument to join Blackwell. Thus, under Defendants' construction of the facts, Kimble was not arrested when he was first handcuffed but instead was arrested only after officers had obtained additional facts on which to support probable cause. *See* Doc. 47, PageID 704, (asserting that only *after* Kimble stated that he wanted to tell Kidd to "keep her mouth shut" was Kimble arrested). Accordingly, the first order of business is to determine when Kimble was subject to arrest.

Nearly all relevant facts are undisputed due to the existence of contemporaneously recorded video evidence. *See, generally, Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769 (2007). Having reviewed the video records, the Court concludes as a matter of law that Kimble was subjected to an arrest, and not merely a *Terry* stop, when he was handcuffed and placed in the back of Knapp's cruiser. In addition, when the historical facts are undisputed, the Court determines whether articulable suspicion or probable cause existed as a matter of law. *See Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996)). Here, the Court finds that police lacked probable cause to arrest Kimble at the moment of arrest.

No one disputes that Kimble's first interaction with police, in the hallway near where the arrest took place, was consensual. Police observed Kimble walking toward them and questioned why he was there. The video record confirms that Kimble did not admit knowing any resident or occupant of any apartment in the corridor, nor did he state his purpose in being there. He quickly complied with instructions to leave.

Kimble's second encounter with police began as consensual but quickly escalated

13

into an arrest. At that point, Kimble's action in driving his SUV to another spot in the same parking lot before exiting and walking back toward where the arrest was taking place had aroused Bode's suspicion. The video shows Kimble waiting in the parking lot while officers approach, greeting them as they draw near. An officer asks if he knows Kidd; Kimble responds "I believe so." Longworth BWC4 43:42–43:48. Kimble is next asked for ID. Without fully awaiting his response, Longworth handcuffs him and officers forcibly detain him in the back of Knapp's patrol car to await transport to District 4 for questioning.

Plaintiff was subject to a *de facto* arrest at that moment, because his seizure exceeded the boundaries of a *Terry* stop. "*Terry* and its progeny … created only limited exceptions to the general rule that seizures of the person require probable cause to arrest." *Florida v. Royer*, 103 S.Ct. 1319, 1325, 460 U.S. 491, 499 (1983). "In the name of investigating a person who is no more than suspected of criminal activity, the police may not …seek to verify their suspicions by means that approach the conditions of arrest." *Id.* During a *Terry* stop,

> the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.

*United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439-40, 104 S.Ct. 3138, 3150 (1984)).

The uncontroverted video record flatly refutes Defendants' argument that they seized Kimble as part of a limited *Terry* stop. Defendants rely heavily on *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809 (6th Cir. 1999), a case in which the Sixth Circuit upheld a lengthy investigatory stop of a vehicle under *Terry* despite the fact

14

that police drew their guns, handcuffed the plaintiffs, and forcibly placed them in police cruisers for questioning. But *Houston* is easily distinguished. There, police stopped a vehicle immediately after an alleged shooting in a bar parking lot. The officer who stopped the vehicle had been at the scene and reasonably believed he was stopping suspects in flight despite the limited vehicle description provided by his partner. Two officers who arrived to assist pulled their guns to force the initially reluctant occupants to exit their vehicle. But at the time, those officers reasonably believed that the occupants were armed and dangerous and had just shot a police officer. Ultimately, the plaintiffs were detained and questioned for at least 35 minutes before being released.

In holding that the investigatory stop was permissible under *Terry* and did not become an arrest despite the significant restraints on plaintiffs' freedom, the Sixth Circuit emphasized the exigent nature of the circumstances. Pursuing officers had to quickly act upon a reasonable suspicion that moments earlier, the occupants of the car had fled a crime scene in which a shooting victim had been seriously injured or killed:

> [The deputy] observed and was assaulted in an uprising at Chuck's, heard a sound that resembled gunfire, heard a voice exclaim, "He's been shot," observed a victim bleeding profusely from the head, noticed a passenger enter a car next to the victim, watched the same car speeding away from the bar's parking lot, and identified the vehicle as best he could under hurried and otherwise difficult circumstances. These "specific and articulable facts," along with rational inferences therefrom, linked the crime at Chuck's to the vehicle that Deputy Schutte identified. Police officers are "regularly forced to make critical decisions under extreme pressure," *Pray v. City of Sandusky,* 49 F.3d 1154, 1159 (6th Cir.1995) (citation omitted). Had Deputy Schutte conducted a more prolonged investigation in the bar's parking lot - rather than sending a radio message to his partner that the suspects were driving away - the most promising lead in the investigation of a serious felony could have quickly evaporated.

> Likewise, Deputy Hopper's actions were premised upon a reasonable suspicion that the occupants of Houston's car were involved in a shooting at Chuck's. Deputy Hopper witnessed the uprising outside Chuck's that night, heard a sound that he believed was gunfire, and heard a shout that someone had been shot. He reasonably believed his partner's radio message to the effect that suspects in the crime were driving away from Chuck's toward Burnett Road.

*Houston*, 174 F.3d at 813-14.

In *Houston*, the use of force did not transform the *Terry* stop into an arrest because of the facts presented. "[W]hen police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are 'reasonably necessary for the protection of the officers.'" *Houston*, 174 F.3d at 814-15 (additional citation omitted). *Houston* further held that the use of handcuffs and placement of suspects into cruisers for questioning did not *automatically* transform the *Terry* stop into an arrest, but is dependent on a fact-specific inquiry. S*ee id*. at 815 (holding that handcuffs and detention in the cruisers "were both reasonably necessary to protect the officers' safety during the investigation."). While the length of the stop presented "a closer question," the court reasoned that the time period did not exceed *Terry* limits given the number of "necessary" but time-consuming steps that were taken, including those required to ensure officer safety as well as the subsequent active field investigation.

> It is not surprising or disturbing that these steps would together last thirty-five minutes (as the defendants claim) or even an hour (as Houston and Perkins maintain). In either case, we conclude that the officers' inquiries and safety precautions were reasonably related to the initial basis for stopping the car.

*Houston*, 174 F.3d at 815.

16

This case is nothing like *Houston*. For starters, it does not involve the hot pursuit of a suspected shooter fleeing a violent crime scene where there was a high likelihood of the only lead "evaporating" if police did not stop the suspect's car. Here, police were executing a warrant for Kidd, who was accused of felonious assault more than 24 hours earlier. Enough time had elapsed for Blackwell to interview witnesses and file a complaint and an investigatory report. To the extent that police had any articulable suspicion that Kimble's dark green SUV might be the "blue SUV" in which Kidd had fled,[8] Kimble's vehicle was parked. Investigating officers easily could and did take the time to confirm the make, model, color and license plate number of Kimble's SUV.

Although Bode assumed that Kimble *might* be the "male black" alluded to in the investigatory report, the report itself contained almost no information about that individual other than that he was age 33, 200 pounds, and approximately 5'10'. Notably, the report did not identify the male as an accomplice or getaway driver or as a suspect in any way, nor did Blackwell so state. As Bode described Kimble's movements, he prefaced his remarks with the statement: "I know he's not a suspect…." In fact, Detective Blackwell was aware of exculpatory evidence that the referenced male was reportedly a passenger who had encouraged the shooter not to shoot.

In response to Bode's mistaken description of the color of Kimble's car as a match to the color of the SUV in the report and his articulated suspicion that Kimble might be involved in some undetermined way based on his car color and actions in the parking lot,

---

[8]Bode mistakenly stated that the report referenced a "blue or greenish SUV," and then reported that Kimble was driving a "blue or greenish SUV." Longworth BWC approx. or 37:02-38:20; Bode affidavit, Doc. 31, PageID 89.

Longworth first suggests to Gleckler that Kimble might be an "accomplice." Longworth BWC4 39:30-39:35 ("[T]he dude who *maybe* was an accomplice in the car has been showing up. He's parked around the corner.") (emphasis added). When Longworth asks Bode to clarify[9] that Kimble drove a "blue SUV," Bode (mistakenly) confirms that it is "blueish greenish." Longworth then states that "they're going to want that [car]." Longworth BWC4 40:00-40:30. Longworth verbalizes doubts about having sufficient manpower to seize the car but suggests that police can "at least get a plate," and adds, "if we can get him stopped we will." *Id..* Bode confirms that Kimble is nearby and speculates: "'I'm gonna assume he was the getaway driver…." Longworth BWC4 41:30-42:25.

In sum, despite Bode's initial statement that Kimble is "not a suspect," Longworth first suggests to Gleckler that he "maybe" is an "accomplice." Bode adds to that hypothesis by speculating that a cursory reference to a male in a "blue SUV" might refer to a "getaway driver." Although Longworth suggests that investigators initially have more interest in the SUV, after hearing Bode's additional "getaway driver" hypothesis and Blackwell's instruction to stop Kimble, Longworth further "assumes" that Blackwell has probable cause to arrest Kimble:

> Yeah, I gave the facts to the detective and he indicated that, that, that uh, he would like him stopped, so, I'm assuming based on that they feel like there's probable cause to stop this person.

Longworth BWC4 42:25-42:35.

---

[9]Longworth's BWC does not capture Gleckler's portion of the conversation. Because Longworth had no personal knowledge of the report, the Court infers that his question about Kimble's car being a "blue SUV" originated from the detectives.

To support even a *Terry* stop, an officer "must be able to articulate more than 'an inchoate and unparticularized suspicion or hunch of criminal activity.'" *Illinois v. Wardlow*, (2000) 528 U.S. 119, 124, 120 S.Ct. 673, 676 (2000) (quoting Terry, 392 U.S. at 27). Significantly more is required to support probable cause for arrest. Here, contrary to Longworth's assumption, no one had probable cause for Kimble's warrantless arrest. At the time Kimble was taken into custody, police collectively knew: (1) Kimble had briefly appeared in a hallway near Kidd's apartment, denied living in any adjacent apartments, and complied with a directive to depart; (2) Bode reported that Kimble's "blueish green" SUV matched the color of the SUV in which Kidd had reportedly fled; (3) a black male (known *not* to be the shooter and whose description did not match Kimble but for age) was seen in an SUV with Kidd[10] (4) Kimble's repositioning his SUV in the parking lot aroused suspicion that he was trying to conceal it; and (5) seconds before being handcuffed, Kimble admitted that he "probably" knew Kidd. While the articulated facts give rise to an inference that Kimble knew Kidd, they provide little to suggest that he was culpable in – or even connected to - the crime alleged to have been committed by Kidd the previous day.

In their motions for summary judgment, Defendants assert that officers had more to go on. In support, they quote from deposition testimony offered by Officer Knapp more than two years after the incident. In his deposition, Knapp testified to his recollection that:

---

[10]The video record does not indicate that Bode or anyone else related the summary witness description to Longworth or to other officers. But the description identifies a black male age 33, with a relatively stocky build at 5' 10" in height and 200 pounds and wearing a red "gator" face covering. On the video and by Defendants' admission, Kimble appears to be of a relatively tall, thin build. He is wearing a white t-shirt and shorts, and has no red gator. *See* Doc. 47, PageID 711, (describing Kimble as a "tall black male").

(1) in the initial hallway encounter Kimble was headed to Kidd's apartment and said he was a family member who was concerned about what was going on; (2) that Kimble left in a vehicle and later returned (rather than simply moving parking spots); (3) that "the vehicle description was a blue or green Ford Escape," precisely matching the color, make and model of Kimble's SUV; (4) that a "thin-male black" drove the referenced Ford Escape to and from the shooting; and that (5) based on the foregoing, police reasonably concluded that Kimble was the "wheelman." Needless to say, Kimble disputes Knapp's recollection, and this Court must construe disputed facts in favor of the Plaintiff. Here, the contemporaneous video evidence also flatly contradicts Knapp's 2024 recollection.

With respect to the handful of facts that the video record supports as collectively known by police prior to Kimble's detention and arrest, Plaintiff highlights Bode's mistake in equating the color of Kimble's dark green Ford Escape with a witness reference to a "blue SUV."  The lack of make or model in the witness description of the "blue SUV" is certainly relevant to the probable cause inquiry; since there are many types of SUVs. As Defendants put it, "being a black male who drives a SUV … describes a large swath of the population." Doc. 48, PageID 735. On that issue, the Court notes that Longworth's BWC footage as he walks toward Kimble's car after the arrest shows a crowded parking lot with multiple parked SUVs of various makes, models, and colors. Longworth repeatedly presses Kimble's electronic key to locate the correct SUV, and takes direction from other officers about its location, color, and license plate number. Police eventually confirm that Kimble's vehicle is a "green Ford Escape," not blue. *Id.*, 45:15 – 48:50.

Still, the Court is not overly troubled by Bode's mistake in reporting that the "blueish greenish" color of Kimble's SUV matched the witness's vague description of the SUV in

which Kidd fled. Bode testified that witnesses often confuse the colors of blue and green. (Doc. 31, ¶ 15). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Heien v. North Carolina*, 574 U.S. 54, 60-61, 135 S.Ct. 530, 536 (2014) (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302 (1949)). On the record presented, Longworth was permitted to rely on Bode's mistaken report that the color of Kimble's SUV matched the color of the unknown make-and-model SUV observed at the crime scene.

On the other hand, it was not reasonable under a probable cause analysis for Longworth to leap to the conclusion that Kimble was an accomplice or (per Bode's hypothesis) a getaway driver rather than merely (at most) a possible witness. Bode's statements made clear that he was expressing a "hunch" that was not based on any known facts or reasonable inferences. Reliance on a series of speculative hunches does not satisfy probable cause. At most, officers collectively had grounds to *briefly* stop and question Kimble in connection with their articulated suspicion that Kimble might be the stocky black male who reportedly had accompanied the female shooter in a blue SUV, and to further investigate whether he was a witness or a type of "accomplice." Even if a reviewing court were to conclude (contrary to this Court) that it was reasonable to rely on Bode's inference that Kimble might be a getaway driver in addition to relying on Bode's mistake about the SUV color, the officers' collective knowledge still amounted to no more than reasonable articulable suspicion for a *Terry* stop.

Moving on, and accepting that Defendants had sufficient (collective) information to conduct a *Terry* stop, that is not what they did. "[T]he investigative methods employed

21

should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005). Here, nothing gave police cause to handcuff Kimble under the pretense that he was armed or dangerous, or to confine him to Knapp's cruiser. The significant restraints on Kimble's liberty without reasonable justification confirms his seizure was a *de facto* arrest. "When actions by police exceed the bounds permitted by reasonable suspicion, the seizure becomes an arrest and must be supported by probable cause." *U.S. v. Richardson*, 949 F.2d at 856 (placement of suspect in the back of a cruiser constituted an arrest under circumstances presented); *see also Brown v. Lewis*, 779 F.3d 401, 416 (6th Cir. 2015).."Although there is no bright line that distinguishes an investigative stop from a *de facto* arrest, the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion." *Houston*, 174 F.3d at 814 (internal citations omitted).

"To determine whether an investigative detention has crossed the line and become an arrest, this court considers factors such as 'the transportation of the detainee to another location, *significant restraints on the detainee's freedom of movement involving physical confinement* or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force.'" *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003) (emphasis added, quoting *Richardson*, 949 F.2d at 857). "Intrusive measures are warranted to secure a detainee <u>only</u> where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers." *Brown v. Lewis*, 779 F.3d at 415 (emphasis added); *see also, Houston*, *supra* (holding that officers reasonably believed that the fleeing individuals were armed and dangerous, with

22

a weapon within reach inside their vehicle).

Here, the felonious assault by a female shooter had taken place more than 24 hours earlier. At the time they handcuffed Kimble, police had the suspected shooter in custody and expected to find the gun in her apartment.[11] Nothing about Kimble's appearance or behavior suggested either that he posed any threat or that he might flee.[12] To the contrary, he was calm and unassuming as he walked toward officers. He paused in the parking lot and waited for them to draw near before greeting them and voluntarily responding to their initial questions. His clothing did not give rise to any reasonable suspicion that he harbored a concealed weapon, nor did any officer testify to that suspicion. Last, while criminal history can support the use of handcuffs during a *Terry* stop under some circumstances, Kimble's criminal history was unknown when officers handcuffed him and placed him into Knapp's cruiser. On the facts presented, the significant restraints on Kimble's freedom without probable cause violated the Fourth Amendment.

The officers' actions following the point at which they handcuffed Plaintiff and placed him in the back of a cruiser also undermine their contention that this was an investigatory stop to determine whether Kimble might be a witness or somehow associated with the crime for which Kidd had been arrested  Officers on the scene made no effort at all to question Kimble in order to confirm or dispel their suspicions even though

---

[11]Longworth stated to Gleckler and Blackwell prior to handcuffing Kimble that officers expected to find the gun inside the apartment because they had observed ammunition and a holster there, and because Kidd could not have gotten rid of the gun while she was surrounded. Longworth BWC4 38:37 – 39:15.
[12]Kimble's car was some distance away. In addition, immediately after being handcuffed, Kimble informed officers of recent foot surgery that precluded his ability to run.

the video record reflects Kimble's eagerness to cooperate. Instead, they denied that they had any questions and told Kimble he was to be detained until one or more off-site detectives questioned him. *Contrast Houston, supra* (where on-site officers actively questioned the suspects and continually conferred with investigators to ascertain the facts throughout the detention).

In a last ditch effort to establish probable cause under the Fourth Amendment, Defendants point out that after placing Kimble in Knapp's cruiser, they discovered his criminal history and were privy to Kimble's voluntary statements that he was there to tell Kidd to keep quiet until she spoke to a lawyer. *See e.g.*, Doc. 48, PageID 731, citing Knapp MVR 10:00- 10:45 (wherein Plaintiff admitted to the officer reviewing his criminal history that "any person with logic" would want to "see what this guy's about."). But such post-arrest information cannot be used to retroactively justify a Fourth Amendment violation. *See United States v. Haynes*, 301 F.3d 669, 678 (6th Cir. 2002).

### B. Defendants are Not Entitled to Qualified Immunity for False Arrest

Defendants alternatively seek summary judgment based on qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S.Ct. 808, 815, 555 U.S. 223, 231 (U.S. 2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)). Qualified immunity "'gives ample room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986)); *see also Dorsey v. Barber,* 517 F.3d 389, 394

(6th Cir. 2008). Qualified immunity applies regardless of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson,* 555 U.S. at 231.

"To overcome a defendant's assertion of qualified immunity, a plaintiff must show both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the violation." *Downard for Estate of Downard v. Martin*, 968 F.3d 594, 599-600 (6th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009)). Plaintiff must make this showing as to each Defendant.

Blackwell argues that he is entitled to qualified immunity on the false arrest claim because "if his instruction was a mistake, it was a reasonable mistake." (Doc. 47, PageID 708). Similarly, Longworth and Gleckler argue that they are entitled to qualified immunity, because they reasonably believed that probable cause existed to arrest Kimble for being "the person who drove Kidd …to and from the scene of the felonious assault." (Doc. 48, PageID 730). This Court disagrees, and concludes that none of the Defendants are entitled to qualified immunity on Plaintiff's false arrest claim.

### 1. Defendant Blackwell

The Court finds no evidence to support Blackwell's position that his mistake (in fact or in law) was reasonable. In the ISS investigation, Blackwell admitted that he ordered Kimble to be transported to District 4 *without* confirming Kimble's consent to being transported. Doc. 49-2, PageID 761-62. The close-in-time CCA report and Blackwell's deposition testimony more than two years later include similar admissions:

> In his interview with CCA, when asked whether Mr. Kimble was a suspect, Officer Blackwell replied, "*My goal was to locate the female I charged. I had no description, no identification from the witnesses of the victim or who the*

25

*male black in the face mask was. I had no idea. He could have been me; he could have been anybody." The only information I have was a black male with a face mask. That could have been me."* He made clear that based on the information he had, he considered Mr. Kimble to be a witness not a suspect.

*See* Doc. 49-1, PageID 744 (italics and quotation marks original).

Blackwell also testified at deposition that he did not suspect Kimble of having conducted any crime when he directed officers to transport him to the police station. After all, he knew that the black male in the witness report was merely a passenger who allegedly told the shooter not to shoot, Doc. 35, PageID 168, 171. He thought Kimble "could be the passenger" and directed officers to transport him to "see if he was the passenger…[and] if he had any knowledge of this case." Doc. 35, PageID 169; *see also id.,* PageID 175, (testifying he "just wanted to speak to him…to see if he was a part of this case"); *id.,* PageID 185, (testifying that it was "possible he could have been the witness … in this case."). Blackwell did not ask officers on the scene to question Kimble because he "wanted to talk to him about the case for myself." *Id.,* PageID 176. Blackwell admitted that at the time he asked for Kimble to be brought in for questioning, he lacked either reasonable suspicion or probable cause to detain him.[13] *Id* , PageID 175.

Blackwell is not entitled to qualified immunity because no reasonable officer could have believed that probable cause existed to arrest Kimble, or to forcibly stop and detain him and to transport him to a police station for questioning, at the time Blackwell gave

---

[13]Blackwell protests that his admitted subjective belief that he lacked articulable suspicion or probable cause does not preclude granting qualified immunity. *See United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991) ("[A] subjective belief by the arresting officer cannot destroy probable cause where it exists."). It is true that "[a]n objective, not subjective, standard applies" to probable cause determinations. *Barera v. City of Mt. Pleasure*, 12 F.4th 617, 620 (6th Cir. 2021) (citing *Devenpeck v. Alford*, 543 U.S. 146 (2004)); Here, however, the application of the requisite objective standard confirms the clear constitutional violation.

that order. On the facts presented, Blackwell's directive to do so violated Kimble's clearly established Fourth Amendment rights.

Blackwell points out that he quickly released Kimble after questioning him at District 4. Blackwell's quick action to release Kimble may impact the calculation of damages. But releasing a plaintiff after first subjecting him to a false arrest is not grounds for an award of qualified immunity.

### 2. Longworth and Gleckler

Longworth and Gleckler also are not entitled to qualified immunity on the false arrest claim. Unlike Blackwell, both Longworth and Gleckler testified in September 2024 to their belief that there was probable cause to arrest Kimble if he was complicit with Kimble in the shooting, consistent with Ohio's law on "aiding and abetting." *See* Longworth Depo., Doc. 42, PageID 287-89 ("[I]t was my understanding and belief …[that Kimble was] to be arrested and taken to District 4 … [b]ecause I believed and… Blackwell believed that Mr. Kimble was involved in to the point where he had criminal liability for the offense being investigated"); *see also* Gleckler Depo., Doc. 33, PageID 114 & 119) ("He could be complicit to felonious assault" and "we're looking at him as co-conspirator to …assault."). Relying on the "collective knowledge" doctrine discussed in *United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012), both officers also cite to Knapp's deposition testimony recalling what he and others knew at the scene. *See e.g.,* Knapp Depo. Doc. 37, PageID 207-08; Cotton Depo., Doc. 39, PageID 236-37.

As explained above, however, the Court cannot credit Knapp's disputed deposition testimony over contemporaneous video records that refute key details in that testimony. Defendants' own deposition testimony is also undermined by the same video record, as

27

well as by unsworn prior admissions that they made during the 2022 CCA investigation.[14]

For example, the CCA report states:

> Detective Gleckler told CCA, " ... we figured that, with all the circumstances around this, that he could definitely be the driver of the car and that he was going to be brought back to District' 4 for interview by Blackwell. He could be the suspect, or he could be the witness." Specialist Gleckler further stated with the information available, the aim was for Mr. Kimble to be detained not arrested. However, he also stated that Mr. Kimble was not free to leave police custody prior to his interview with Officer Blackwell at District 4.

*Id*. (quotation marks original). The CCA report also states: "In interviews with Specialist Gleckler and Officer Blackwell, neither could state what offense Mr. Kimble may have committed." *Id.*

Gleckler was not assigned to the shooting case for which Kidd was being arrested and became involved only after he answered Longworth's call. He actively consulted with Blackwell, and relayed information about the case back and forth. Because he directed the officers on site to detain Kimble at a point in time when the officers' collective information did not support probable cause, he is not entitled to qualified immunity. *See Bunkley v. City of Detroit, Michigan*, 902 F.3d 552, 563 (6th Cir. 2018) (officer not present at arrest who received information from officers on the scene and instructed them to arrest plaintiff could be held liable for false arrest).

Longworth, as the officer on the scene who physically made the arrest by handcuffing Kimble and directing him to be place in Knapp's cruiser to await questioning

---

[14]Defendants argue that the entire CCA report should be excluded as hearsay. The Court agrees that the CCA's legal findings are inadmissible on summary judgment. However, any statements made by Defendants that appear in the CCA report (none of which Defendants deny) may be considered. *See* Fed. R. Evid. 801(d). Even if the CCA statements were excluded, the uncontroverted contemporaneous video record still refutes Defendants' subsequent recollection, at their respective depositions, of the facts known by or related to them at the time of arrest.

by detectives at some future time, also is not entitled to qualified immunity. The collective knowledge doctrine does not insulate him from liability because the directive to detain Kimble was not plausible based on the collective facts known at the time. *Accord Bunkley*, 902 F.3d at 558 and 562 (upholding denial of qualified immunity for false arrest, rejecting claim of arresting officers that they were "simply following orders" where they made unsupported assumptions that plaintiff and his father had participated in a  shooting based on a description that could describe "thousands" of black men, and did not investigate or question plaintiff before the arrest).

### IV.    The Failure-to-Intervene Claim

In response to Defendant Blackwell's motion for summary judgment, Plaintiff "abandons his failure to intervene claim against defendant Blackwell and consents to its dismissal with prejudice by the Court," on the basis that "Blackwell cannot be liable for failure to intervene in his own unlawful conduct." Doc. 50, PageID 794. Therefore, the Court grants judgment to Blackwell on Plaintiff's failure-to-intervene claim.

In contrast, the Court will deny summary judgment to Defendants Gleckler and Longworth. Defendants cite to *White v. Goforth*, No. 22-5409, 2023 WL 3546527 (6th Cir. May 18, 2023), an unpublished case in which the court noted that "[s]uccessful failure-to-intervene claims are rare and largely limited to one context - the excessive use of force." But seven years ago in the published *Bunkley* case, the Sixth Circuit upheld the denial of qualified immunity for failure-to-intervene claims brought against officers who failed to prevent a false arrest. The arresting officers in *Bunkley* were not the investigators of the shooting in question, knew that the arrestees did not "reasonably match the descriptions" of the suspected shooters, did not actually question the plaintiff Bunkley before arresting

him, and knew that a stated reason for his arrest – an alleged probation violation – was false. *Id.*, 902 F.3d at 566. In affirming the denial of qualified immunity, the Sixth Circuit held that under the facts as construed on summary judgment, all of the officers "had time to stop, intervene, and prevent this arrest-without-probable-cause."  *Id.*

The defense offered by Gleckler and Longworth is similar to that asserted by the officers in *Bunkley*. Gleckler testified that he had no reason to question "exactly what Carl [Blackwell] said, that Carl said, I want him brought back to District 4 for questioning." Gleckler Depo. Doc 33, PageID 116.  Longworth similarly "assumed" that the detectives had probable cause for arrest, despite knowing that his collective knowledge supported no more than a reasonable suspicion to conduct a *Terry* stop. "*Plausible* instructions from a superior or fellow officer support qualified immunity where, *viewed in light of the surrounding circumstances*, they could lead *a reasonable officer to conclude* that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances)." *Bunkley*, 902 F.3d at 562 (quoting *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000) (emphasis in original)). Gleckler and Longworth cannot escape liability based on Blackwell's directive because they could not reasonably have concluded that probable cause existed, and both had ample time to stop, intervene, and prevent the unlawful arrest that occurred.

## V.    The Civil Conspiracy Claim

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action. *Revis v. Meldrum*, 489 F.3d. 273, 290 (6th Cir. 2007). It requires proof that "'(1) a single plan exists, (2) the conspirators shared a conspiratorial objective to deprive the plaintiff[] of [his] constitutional rights, and (3) an overt act was

30

committed' in furtherance of the conspiracy that caused the injury." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis*, 489 F.3d at 290). Plaintiff explains his civil conspiracy claim against the defendants as follows:

> Blackwell knowingly commanded the wrongful arrest of the plaintiff. Gleckler was well aware of what was happening and willingly passed along Blackwell's unlawful command. And Longworth committed the overt act of wrongfully arresting and causing the transport of the[] plaintiff.

Doc. 50, PageID 794.

All three Defendants are entitled to summary judgment on Plaintiff's civil conspiracy claim because he fails to point to any evidence that the three Defendants actively conspired *together*, or that they had a single planned objective to arrest Kimble without probable cause. Rather than suggesting any sort of "plan" or shared conspiratorial objective to violate Kimble's rights, the record suggests that independently, the Defendants committed a combination of cumulative errors akin to a game of telephone gone awry. Thus, even though a reasonable jury could hold each Defendant liable for his part in arresting Kimble without probable cause, there is absolutely no evidence of any Defendant's intent to act in concert to commit constitutional violations. Accordingly, all three Defendants are entitled to summary judgment on this claim.

## VI. Conclusion and Order

For the reasons discussed, **IT IS ORDERED THAT** Defendants' motions for summary judgment (Docs. 47, 48) are **GRANTED in part and DENIED in part**:

1. Summary judgment on the false arrest claim is DENIED for all Defendants;

2. Summary judgment on the failure-to-intervene claim is GRANTED to Defendant Blackwell but is DENIED to Defendants Gleckler and Longworth;

31

3. Summary judgment on the civil conspiracy claim is GRANTED to all Defendants;

4. Consistent with this Memorandum Opinion and Order, Plaintiff's remaining claims shall proceed to trial on May 5, 2025.

*s/Stephanie K. Bowman*
*S*tephanie K. Bowman
United States Magistrate Judge
